1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALD TAYLOR, | CASE NO. 1:07-cv-00032-AWI-SMS PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING THE MOTION FOR |
| v. | SUMMARY JUDGMENT FILED BY DEFENDANTS WOFFORD AND McKESSON |
| KEN CLARK, et al., | BE GRANTED AND DENIED |
| Defendants. | (Doc. 115) |
| _____/ | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

## **FINDINGS AND RECOMMENDATIONS**

**I.    Procedural History**

Plaintiff Gerald Taylor ("Plaintiff") is a state prisoner proceeding in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983 and California tort law.  This action is proceeding on Plaintiff's First Amended Complaint, filed June 20, 2007, against Defendant McKesson for battery and use of excessive physical force in violation of the Eighth Amendment; against Defendant Wofford for failure to protect Plaintiff, in violation of the Eighth Amendment; and against Defendants Adams and Clark under a theory of supervisory liability.  (Doc. 15, 1st Amd. Comp. and Doc. 19, Cog Claim Ord.)

Defendants McKesson, Wofford, Adams and Clark ("Defendants") filed for dismissal for failure to state a claim and for failure to exhaust his administrative remedies prior to filing suit (Docs. 30, 34, and 35) which was granted in part and denied in part: (1) Defendant McKesson's motion to dismiss the battery claim against him for failure to allege compliance with the

1

California Tort Claims Act was granted with leave to amend; (2) Defendant McKesson's motion

to dismiss the excessive force claim against him for failure to sufficiently allege an injury, the

motion to dismiss the section 1983 supervisory liability claim against them for failure to state a

claim by Defendants Adams and Clark, and the motion to dismiss for failure to exhaust by

Defendants' Wofford, Adams, and Clark were all denied; and (3) Plaintiff was granted thirty

days within which to file a second amended complaint curing the defects in his state law battery

claim.  (Docs. 41-42.)  Plaintiff did not amend his complaint; rather he withdrew his state law

battery claim against Defendant McKesson.  (Doc. 43.)

Defendant Wofford filed a motion for judgment on the pleadings under unenumerated

Rule 12(b) and Rule 12(c) of the Federal Rules of Civil Procedure (Doc. 85) which was denied

(Docs. 100, 130).

On December 6, 2010, Defendants McKesson and Wofford filed a motion for summary

judgment.  (Doc. 115.)  Plaintiff filed his opposition[1] (Doc. 131) and Defendants filed their

replies.  (Docs. 140, 141.)  The motion has been deemed submitted.[2]  Local Rule 230(l).

## II.   Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine

issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district
> court of the basis for its motion, and identifying those portions of
> "the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any," which it
> believes demonstrate the absence of a genuine issue of material
> fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

---

[1] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in an order filed on May 5, 2008.  *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

[2] On January 25, 2011, a telephonic conference was held at which time the hearing of this motion was taken off calendar and Plaintiff was granted leave to file a sur-reply in the motion for summary judgment which was filed by Defendants Adams and Clark.  No such leave was granted in this motion.

in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id*. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id*. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record they wish the Court to consider. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not undertake to mine the record for triable issues of fact. *Id.*

///

//

3

1  **III.**   **Plaintiff's Cognizable Allegations and Claims in the First Amended Complaint[3]**

2        Plaintiff alleged that prior to his transfer to the California Substance Abuse Treatment

3  Facility and State Prison ("SATF") in Corcoran, California he was classified as "DPH-

4  Deaf/hearing Impaired" which necessitated his use of a hearing aid in order to communicate with

5  others and that he required a "Hearing Impairment Identification Vest and transfer to a Disability

6  Placement Program ("DPP") Facility such as SATF.  (Doc. 15, 1st Amd. Compl, §§ 14, 15.)

7        Upon arrival at SATF, Plaintiff was examined by Defendant Nurse J. Wofford, whom he

8  informed of his need, but did not issue Plaintiff an identification vest.  (*Id.*, at § 17.)  Upon return

9  from a court appearance, Plaintiff once again saw Defendant Wofford and requested an

10  identification vest as well as a battery for his hearing aid – which was not working.  (*Id.*, at § 19.)

11  Defendant Wofford told Plaintiff she would get him a battery as soon as she could, but did not

12  immediately provide him with a battery or an identification vest.  (*Id.*)

13        A few days later, while Plaintiff was in the shower, he saw Defendant CO McKesson and

14  another officer enter his cell and exit with what turned out to be Plaintiff's glue sticks.  (*Id.*, at §§

15  21, 22.)  Upon exiting the shower, Plaintiff made inquiry regarding the glue sticks during which a

16  verbal exchange took place in which Plaintiff ultimately requested an inmate appeal form 602

17  (hereinafter "a 602").  (*Id.*, at §§ 23-38.)  As Plaintiff turned to return to his cell, Defendant

18  McKesson grabbed Plaintiff from behind and threw Plaintiff to the floor causing injuries and

19  pain.  (*Id.*, at §§ 38, 39.)  Plaintiff alleges that this incident occurred, at least in part, because his

20  hearing aid was not functioning properly and he did not have an identification vest.  (*Id.*, at §§

21  52-55.)

22        Plaintiff's First Amended Complaint was screened pursuant to 28 U.S.C. § 1915A and

23  found to state cognizable claims for relief against Defendant Wofford for failure to protect

24  Plaintiff, in violation of the Eighth Amendment, against Defendant McKesson for battery and use

25  of excessive physical force in violation of the Eighth Amendment, and against Defendants Clark

26

27        [3] This is a rendition of the factual allegations upon which Plaintiff's claims against Defendants were found
28  cognizable which are presented here for overview purposes only.  Undisputed and disputed material facts are
discussed where applicable in the following sections.

1  and Adams under a theory of supervisory liability.  (Doc. 19.)

2  **IV.  Defendant Wofford**

3      Defendant Wofford argues that Plaintiff cannot prove his failure to protect claim against

4  her  because she had no reason to suspect Plaintiff's safety was in jeopardy.  Defendant Wofford

5  established effective communication with Plaintiff  without use of his hearing aids, specifically

6  noting that Plaintiff answered all of her questions without hesitation.  (Doc. 115-1, Def. MSJ,

7  2:2-5.)

8      **A.  Eighth Amendment -- Failure to Protect/Safety**

9      "The treatment a prisoner receives in prison and the conditions under which he is

10  confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S.

11  825, 832 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)).  Prison officials have a

12  duty to take reasonable steps to protect inmates from physical abuse.  *Farmer*, 511 U.S. at 833;

13  *Hoptowit v. Ray*, 682 F.2d 1237, 1250-51 (9th Cir. 1982).  To establish a violation of this duty,

14  the prisoner must establish that prison officials were "deliberately indifferent to a serious threat

15  to the inmates's safety." *Farmer*, at 834.  The question under the Eighth Amendment is whether

16  prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently

17  substantial 'risk of serious damage to his future health ... .'" *Farmer*, 511 U.S. at 843 (citing

18  *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).  The Supreme Court has explained that

19  "deliberate indifference entails something more than mere negligence ... [but] something less

20  than acts or omissions for the very purpose of causing harm or with the knowledge that harm will

21  result." *Farmer*, 511 U.S. at 835.  The Court defined this "deliberate indifference" standard as

22  equal to "recklessness," in which "a person disregards a risk of harm of which he is aware." *Id.*

23  at 836-37.

24      The deliberate indifference standard involves both an objective and a subjective prong.

25  First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Id.* at 834.

26  Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate

27  health or safety." *Id.* at 837; *Anderson v. County of Kern*, 45 F.3d 1310, 1313 (9th Cir. 1995).

28  To prove knowledge of the risk, however, the prisoner may rely on circumstantial evidence; in

fact, the very obviousness of the risk may be sufficient to establish knowledge. *Farmer*, 511 U.S. at 842; *Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995).

## 1.   **Defendant's Motion**

In support of the motion for summary judgment on Plaintiff's claims against Defendant Wofford, Defendant presents the following facts which she asserts are undisputed.  Plaintiff is an inmate incarcerated with the CDCR.   Before being incarcerated,  Plaintiff suffered a head trauma that diminished his hearing.  (Doc. 115-2, Defs. Sep. Stmt of Undisp Facts (hereinafter "DUF"), No. 1.)  Plaintiff testified that without hearing aids, he has twenty percent of his hearing.  (*Id.*) Without the use of Plaintiff's hearing aids, Plaintiff can converse through a combination of his limited hearing and reading lips.  (*Id.* at DUF No. 2.)

When an inmate's assistive device, like a hearing aid, is not functioning properly, the proper procedure is for the inmate to notify medical personnel that the assistive device is malfunctioning or broken by completing a CDC Form 7362 Healthcare Services Request.  (*Id.* at DUF No. 4.)  The yard nursing staff then triages the request and routes it to the proper person. (*Id.*)  When an inmate requires a vest to alert staff that he has a disability, known as an ADA vest, like a hearing-impaired vest, the vest is not typically issued by medical staff, but by custody staff.  (*Id.* at DUF No. 5.)  Medical staff may issue a chrono for an ADA vest if medical staff determine that the inmate meets the criteria for a vest.  (*Id.* at DUF No. 6.)  Hearing-impaired inmates classified as DNH, indicating that the hearing impairment does not impact placement, generally do not meet the criteria for an ADA vest.  (*Id.* at DUF No. 7.)  When a DNH inmate's assistive device is not functioning properly and the inmate has notified medical staff, a reasonable accommodation, like a vest, will be issued if needed and until the inmate is provided with a properly functioning assistive device.  (*Id.* at DUF No. 8.)

Since January 2004, Defendant Wofford was a Receiving and Releasing (R&R) nurse at SATF.  (*Id.* at DUF No. 10.)  For inmates leaving an institution, R&R nurses review an inmate's chart and prepare: (1) a CDC Form 7371, which is a medicine profile; (2) a CDC Form 1845 that documents any ADA issues; and (3) a referral for services if the inmate is scheduled for any kind of surgery or outside medical appointments. (*Id.* at DUF No. 11.)  For inmates coming into an

institution, R&R nurses establish communication with the inmate, interview the inmate, review the inmate's medical file, and, if necessary, implement the inmate's medical care and make any necessary medical referrals.  (*Id.* at DUF No. 12.)  As part of the intake process, the R&R nurse reviews the medical file for CDC 1845 forms that document any disabilities, including hearing impairment, and that information is disseminated to the necessary parties.  (*Id.* at DUF No. 13.) Inmates with hearing impairments or disabilities are identified through the R&R intake process. (*Id.* at DUF No. 14.)  If an inmate has a hearing impairment, Defendant Wofford will document the impairment on the CDC Form 7277.  (*Id.* at DUF No. 15.)

As an R&R nurse, Defendant Wofford's duties did not include providing an inmate with healthcare appliances, including hearing aids.  (*Id.* at DUF No. 16.)  As an R&R nurse, Defendant Wofford's duties did not include ensuring the inmate has batteries for his hearing aid, as that is the responsibility of the yard clinic.  (*Id.* at DUF No. 17.)  Nor did Defendant Wofford's duties include identifying whether an inmate should have a hearing-impaired vest or ensuring that a hearing-impaired inmate has a hearing-impaired vest.  (*Id.* at DUF No. 18.)  On January 27, 2006, Plaintiff arrived at SATF and Defendant Wofford performed the intake evaluation.  (*Id.* at DUF No. 20.)  During the intake evaluation, Plaintiff was identified as hearing-impaired.  (*Id.* at DUF No. 21.)  Plaintiff's hearing aids were working on January 27, 2006.  (*Id.* at DUF No. 22.)

During Defendant Wofford's evaluation, Plaintiff and Defendant Wofford conversed. (*Id.* at DUF No. 23.)  Plaintiff claims that during the evaluation, he told Defendant Wofford that he was hearing impaired and needed a hearing-impaired identification vest. (*Id.* at DUF No. 24.) Plaintiff and Defendant Wofford did not discuss the extent of Plaintiff's hearing impairment during the January 27, 2006 evaluation.  (*Id.* at DUF No. 25.)  Defendant Wofford had a copy of Plaintiff's medical file at the time of the January 27, 2006 evaluation.  (*Id.* at DUF No. 26.) Plaintiff's medical file did not contain any current medical documents classifying Plaintiff as requiring a hearing-impaired vest as of January 27, 2006.  (*Id.* at DUF No. 27.)  Plaintiff did not request hearing aid batteries during the January 27, 2006 evaluation.  (*Id.* at DUF No. 28.) Plaintiff left SATF on February 2, 2006 and returned to SATF on March 2, 2006.  (*Id.* at DUF No. 29.)

When Plaintiff returned to SATF on March 2, 2006, Plaintiff went through the R&R process again, including a medical evaluation by Defendant Wofford.  (*Id.* at DUF No. 30.) During the intake evaluation, Plaintiff was identified as being hearing-impaired, and Defendant Wofford documented that Plaintiff's hearing aids were in his property.  (*Id.* at DUF No. 31.) On March 2, 2006, Plaintiff's hearing aids were not working.  (*Id.* at DUF No. 32.)  During the March 2, 2006 evaluation, Plaintiff communicated with Defendant Wofford by talking with her; Plaintiff could hear Defendant Wofford's words a little and read her lips.  (*Id.* at DUF No. 33.) Plaintiff did not tell Defendant Wofford that he could not hear her or that he was reading her lips while they were communicating.  (*Id.* at DUF No. 34.)

In March 2006, the process for getting hearing aid replacement batteries was to request them from the yard medical clinic (*id.* at DUF No. 41), which Plaintiff admits in his argument is how he usually acquired hearing aid batteries (Doc. 131, Plntf. Opp. P&A, 9:23-26).  Yet, Plaintiff claims[4] that during the March 2, 2006 evaluation: (1) he told Defendant Wofford that his hearing aids were not working because the batteries were dead and that he needed hearing aid batteries and a hearing-impaired vest (*id.* at DUF No. 35); (2) Defendant Wofford did not respond to his request for hearing aid batteries and a hearing-impaired vest (*id.* at DUF No. 36); and (3) Defendant Wofford told Plaintiff she would get him hearing aids as soon as she could (*id.* at DUF No. 37).  Plaintiff did not have his hearing aids on him at the time of the March 2, 2006 evaluation as they were "in his property."  (*Id.* at DUF No. 38.)  It is undisputed that: (1) on March 2, 2006, Plaintiff did not tell Defendant Wofford what type of battery he needed for his hearing aids (*id.* at DUF No. 39); (2) Plaintiff's hearing aids use a #13 battery (*id.* at DUF No. 3); and (3) Defendant Wofford, who is also hearing impaired, gives inmates hearing aid batteries out of her own personal stock testified if an inmate tells her he needs hearing aid batteries and his hearing aid uses the same #13 batteries as she uses.  (*Id.* at DUF No. 40.)

On March 2, 2006, Plaintiff did not tell anyone (other than Defendant Wofford) that his

---

[4] While Defendants listed these three claims as part of their undisputed facts, the prefacing verbiage is noted as indicating that these are *Plaintiff claims* and are listed apparently to show the claims that Defendants assert are unfounded and are not written as an indication of admission to the veracity of their substance by Defendants.

hearing aid batteries were not working, that he needed a hearing-impaired vest, or that he was having a hard time hearing. (*Id.* at DUF No. 42-43.) Nor did Plaintiff's medical file contain any current medical documents classifying Plaintiff as requiring a hearing-impaired vest as of March 2, 2006. (*Id.* at DUF No. 44, CMO Lopez Decl., ¶11.) Under SATF's policies and procedures, Defendant Wofford did not have an obligation to provide Plaintiff with a hearing-impaired vest on or before March 6, 2006. (*Id.* at DUF No. 45, CMO Lopez Decl. ¶16.)

Following the March 2, 2006 evaluation with Defendant Wofford, Plaintiff was placed in an orientation cell in D Facility until March 6, 2006. (*Id.* at DUF No. 46.) From March 2, 2006 through March 6, 2006, Plaintiff did not tell anyone that he could not hear, that he needed hearing aid batteries, or that he needed a hearing-impaired vest. (*Id.* at DUF No. 47.)

Defendant argues this evidence shows "Plaintiff cannot demonstrate that Defendant Wofford's failure to provide [hearing aid batteries or an identification vest] gives rise to an Eighth Amendment violation because Defendant Wofford had no reason to believe that Plaintiff faced a known threat of serious harm by another."  Even though Plaintiff was not wearing his hearing aids and advised Defendant Wofford on March 2, 2006 that his hearing aids were in his property, Defendant Wofford had an "unencumbered conversation with Plaintiff" such that Defendant Wofford "had no reason to believe that Plaintiff would not be able to communicate with any officer or that his lack of hearing aid batteries or hearing-impaired identification vest would subject Plaintiff to the use of force by a correctional officer who did not know Plaintiff could not hear." (Doc. 115-1, Def. MSJ, 10:9-21.)

Defendant also argues that Plaintiff cannot demonstrate that Defendant Wofford acted with the requisite level of intent because her duties did not include providing inmates with hearing aid batteries; her practice is to provide an inmate with a battery from her own personal stock if an inmate informs her that he needs a battery and the battery is the same size that she uses as she is also hearing impaired; Plaintiff did not tell Defendant Wofford what size battery he uses (which is the same size Defendant Wofford uses); and if Plaintiff told Defendant Wofford the size he needed, she would have provided them to him. (*Id.* at 10:22-11:3.)

Finally, Defendant argues that since Defendant Wofford's duties did not include

identifying whether an inmate needed a hearing-impaired vest, or otherwise ensuring that an inmate has such a vest, her failure to provide Plaintiff with a hearing-impaired vest does not constitute liability for a violation of Plaintiff's constitutional rights.  (*Id.* at 11:4-9.)

When resolving a claim under the Eighth Amendment against individual defendants, causation must be resolved via "a very individualized approach which accounts for the duties, discretion, and means of each defendant."  *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988) *citing with approval Williams v. Bennett*, 689 F.2d 1370, 1384 (11th Cir. 1982) ("There can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party.  One may be callously indifferent to the fate of prisoners and yet not be liable for their injuries.  Those whose callous indifference results in liability are those under a duty -- possessed of authority and means -- to prevent the injury.")

Defendant Wofford submitted evidence to show that her job duties did not include obtaining batteries for inmates' hearing aids (Doc. 115-2, DUF Nos. 11-18; Wofford Dep. 10:14-13:4, 14:11-15:19, 19:13-25:21, 28:23-30:3-18, 31:5-22, 55:19-56:12); the proper procedure for an inmate to obtain batteries for a hearing aid was for the inmate to fill out and submit a CDC Form 7362 Healthcare Services Request to yard nursing staff (*id*. DUF Nos. 4, 41; CMO Lopez Decl. ¶ 5); her job duties did not include determining the need for a vest identifying an inmate as hearing impaired or distributing such vests to inmates; rather, custody staff typically distributes such vests (*id*. DUF Nos. 5, 18; CMO Lopez Decl. ¶ 6); Plaintiff and Defendant Wofford did not discuss the extent of Plaintiff's hearing impairment during the January 27, 2006 evaluation (*id*. DUF No. 25; Plntf. Dep. 35:13-16); Plaintiff did not request hearing aid  batteries during the January 27, 2006 evaluation (*id*. DUF No. 28; Plntf. Dep. 38:12-18); during the March 2, 2006 evaluation, Defendant Wofford noted that Plaintiff's hearing aids were in his property (*id*. DUF No. 31; Wofford Dep. 37:20-38:18, Ex. 2); Plaintiff and Defendant Wofford communicated on March 2, 2006 without the use of his hearing aids as Plaintiff could hear her words a little and read her lips and Plaintiff did not tell her that he could not hear her or was reading her lips while they communicated (*id*. DUF Nos. 32-34; Plntf. Dep. 40:24-41:14); Plaintiff did not tell Defendant Wofford what type of battery he needed for his hearing aids (*id*.

DUF No. 39; Plntf. Dep. 43:16-18); and  Nurse Wofford, who is also hearing impaired, testified

hat if an inmate tells her that he needs hearing aid batteries and his hearing aid uses a #13, then

she will give the inmate a hearing aid battery out of her own personal stock (*id*. DUF No. 40;

Wofford Dep. 51:11-55:18).  In particular, these two facts logically lead to the conclusion that

Plaintiff did not discuss his hearing aid batteries with Defendant Wofford in the March 2, 2006

visit, because if such a discussion had occurred, Plaintiff would have needed to tell Defendant

Wofford the size of battery he used for her to secure for him, and once it was revealed that

Plaintiff also used #13 batteries, Defendant Wofford would have given him batteries from her

own supply.  (*Id*. DUF Nos. 39-40; Plntf. Dep. 43:16-18, Wofford Dep. 51:11-55:18.)

The pivotal facts presented show that it was not within Defendant Wofford's duties or

authority to obtain either batteries for Plaintiff's hearing aids or to secure him a hearing impaired

identification vest.  The Court finds that, as to Plaintiff's claim that Defendant Wofford was

deliberately indifferent to his serious medical needs, Defendant has met her initial burden of

informing the Court of the basis for her motion and identifying admissible evidence to

demonstrate the absence of a genuine issue of material fact.  The burden therefore shifts to

Plaintiff to establish that a genuine issue as to any material fact actually does exist.  *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  As stated above,

in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the

mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in

the form of affidavits, and/or admissible discovery material, in support of his contention that the

dispute exists.  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *First Nat'l Bank*, 391

U.S. at 289; *Strong v. France*, 474 F.2d 747, 749 (9th Cir. 1973).

### 2.    **Plaintiff's Opposition**

Plaintiff argues that Defendant Wofford was deliberately  indifferent to a serious risk of

harm to Plaintiff regarding his hearing disability and submits the following facts in an effort to

establish a dispute.  Plaintiff has been hearing impaired since the age of eighteen as a result of

significant head trauma.  (Doc. 131-2, Plntf. Sep. Stmt. of Add. Facts, (hereinafter "PDF") No.

2.)  Without hearing aids Plaintiff has roughly twenty percent of his hearing.  (Doc. 115-2, DUF

No. 1.)  On November 7, 2005, a CDC 1845 completed by a physician classified Plaintiff as DNH – a permanent disability.  (*Id.* at DUF No. 44.)  Under "Health Care Appliance/ Identification Vest" the physician checked off the "vest" box.  (*Id.*)

On January 27, 2006, Plaintiff arrived at California Substance Abuse Treatment Facility ("SATF") from Lancaster State Prison.  (*Id.* at DUF No. 9.)  Defendant Wofford performed the initial health screening for Plaintiff.  (*Id.* at DUF No. 20.)  Defendant Wofford completed a CDC 7277 and noted that Plaintiff was deaf with a hearing impairment.  (*Id.* at DUF No. 21.)  Defendant Wofford indicated on the form that Plaintiff had special health care needs or current medical complaints, referencing the hearing impairment.  (Doc. 131-2, PDF No. 3.)  Defendant Wofford had a copy of Plaintiff's medical record during the January 27, 2006, evaluation.  (Doc. 115-2, DUF No. 26.)  Plaintiff acknowledges that he did not tell Defendant Wofford that he needed hearing aid batteries.  (*Id.* at DUF No. 28.)  However, he did tell Defendant Wofford that he was hearing impaired and required an identification vest.  (*Id.* at DUF No. 24.)  Defendant Wofford responded by instructing him to wait.  (Doc. 131-2, PDF No. 3.)  On February 2, 2006, Plaintiff left SATF for court.  (Doc. 115-2, DUF No. 29.)

On March 2, 2006 Plaintiff again arrived at SATF from Lancaster State Prison, at which time Defendant Wofford again performed his initial health screening.  (*Id.* at DUF No. 30.)  Defendant Wofford noted that Plaintiff had a hearing impairment on a CDC 7277 form.  (*Id.* at DUF No. 31.)  During this evaluation Plaintiff's hearing aids were not working.  (*Id.* at DUF No. 32.)  Plaintiff claims that he told Defendant Wofford that he was not wearing his hearing aids because they were not working because the batteries were dead and that he needed batteries and a hearing-impaired vest.  (*Id.* at DUF No. 35.)  Plaintiff also claims that Defendant Wofford responded by telling Plaintiff that she would get him batteries as soon as she could.  (*Id.* at DUF No. 36.)

Plaintiff argues that Defendant Wofford's "conduct in failing to provide Plaintiff with hearing aid batteries or an identification vest was a reckless disregard for Plaintiff's safety" which "created a dangerous condition that posed a substantial risk of harm to Plaintiff."  (Doc. 131, Plntf. Resp. to MSJ, 8:13-16.)  Plaintiff also argues that, regardless of her stated job duties,

Defendant Wofford assumed the duty of obtaining batteries for Plaintiff's hearing aids when she told Plaintiff she would do so which obviated the necessity for Plaintiff to follow usual prison procedures (*Id.*, at 9:23-28) and that being a medical official, the Eight Amendment imposed a duty on Defendant Wofford to act outside of her job duties (*Id.* at 10:1-11). Notably, Plaintiff does not cite any authority to specifically establish that Defendant Wofford was required to act beyond the scope of her job duties and the Court finds none.

These arguments do not meet Plaintiff's burden to establish the existence of a factual dispute. Defendant Wofford's responsibility to act beyond her job duties is not a question of disputed fact; rather, it is a question of law which is properly decided in Defendant Wofford's favor. *See Leer v. Murphy*, 844 F.2d at 633-34. Accordingly, Defendant Wofford's motion for summary judgment should be granted. Since Defendant Wofford is entitled to summary judgment on the merits, her request for qualified immunity need not be reached.

## V.   Defendant McKesson

Defendants argues that he is entitled to summary judgment on Plaintiff's claim against him because their evidence shows that "Defendant McKesson did not know that Plaintiff was hearing-impaired and from Defendant McKesson's perspective, Plaintiff physically threatened Defendant McKesson, and then resisted Defendant McKesson's cuff-up order" (Doc. 115-1, Def. P&A, 2:6-9) such that Defendant McKesson's use of force was reasonable under the circumstances (*Id.* at 11:13-14:23).

### A.   Eighth Amendment -- Excessive Force

When a prison official stands accused of using excessive physical force in violation of the cruel and unusual punishment clause of the Eighth Amendment, the question turns on whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the purpose of causing harm. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). In determining whether the use of force was wanton and unnecessary, it is proper to consider factors such as the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of the forceful response.

*Hudson*, 503 U.S. at 7.  The extent of a prisoner's injury is also a factor that may suggest whether

the use of force could plausibly have been thought necessary in a particular situation.  *Id.*

Although the absence of serious injury is relevant to the Eighth Amendment inquiry, it is not

determinative.  *Id.*  That is, use of excessive physical force against a prisoner may constitute cruel

and unusual punishment even though the prisoner does not suffer serious injury.  *Id.* at 9.

### 1.    **Defendant's Motion**

In support of this motion, Defendant presents the following allegedly undisputed facts.  In

March 2006, Defendant McKesson was a correctional officer in SATF's D yard.  (Doc. 115-2, at

DUF No. 48.)  On March 6, 2006, Plaintiff was released from his orientation cell in D Facility to

take a shower.  (*Id.* at DUF No. 49.)  While in the shower, Plaintiff saw Officer Lindquist and

Defendant McKesson conduct a search of his cell and Plaintiff saw Defendant McKesson walk

away with some of Plaintiff's property.  (*Id.* at DUF No. 50.)

After his shower, Plaintiff went to the office to find out why property had been removed

from his cell.  (*Id.* at DUF No. 51.)  Plaintiff was not wearing his hearing aids when he went to

the office.  (*Id.* at DUF No. 52; Taylor Dep. 71:19-20.)  Plaintiff then conversed with Officer

Lindquist and Defendant McKesson; Plaintiff's conversation with Defendant McKesson

consisted of verbal exchanges in two different locations.  (*Id.* at DUF No. 53.)  Plaintiff did not

tell Defendant McKesson or Officer Lindquist that he was hearing impaired.  (*Id.* at DUF No.

54.)  Plaintiff was able to converse with Defendant McKesson through a combination of lip

reading and hearing some of Defendant McKesson's words.  (*Id.* at DUF No. 55.)

Officer Lindquist and Defendant McKesson heard Plaintiff state to Officer McKesson

that Plaintiff could "dust him off."  (*Id.* at DUF No. 56; Lindquist Dep. 18:20-19:10; McKesson

Dep. 96:18-97:7.)  Officer Lindquist and Defendant McKesson understood Plaintiff to be

threatening an assault on Defendant McKesson.  (*Id.* at DUF No. 57; Lindquist Dep. 19:3-10,

21:22:9; McKesson Dep. 97:8-14.)  Officer Lindquist and Defendant McKesson both felt

threatened by Plaintiff's comment that he could "dust him off."  (*Id.* at DUF No. 58; Lindquist

Dep. 20:25-21:9, 21:20-23, 58:9-24; McKesson Dep. 96:18-97:14, 118:8-17.)

Following Plaintiff's statement that he could "dust him off," Defendant McKesson

14

ordered Plaintiff to turn around and cuff up.  (*Id.* at DUF No. 60.)  Officer Lindquist believes

Plaintiff understood the order to cuff-up.  (Lindquist Dep. 39:11-40:21.)  Plaintiff does not know

whether Defendant McKesson gave Plaintiff any kind of order after he turned to walk away from

the office.  (Doc. 115-2, DUF No. 66.)  After Defendant McKesson told Plaintiff to cuff-up,

Plaintiff put his hands on the window outside of the office.  (*Id.* at DUF No. 61.)  Defendant

McKesson then proceeded to attempt cuffing-up Plaintiff when Defendant McKesson observed

Plaintiff to start twisting and turning.  (*Id.* at DUF No. 62.)  Officer Lindquist observed Plaintiff

come off of the wall and start arguing with Defendant McKesson.  (Lindquist Dep. 19:18-20:7.)

Officer Lindquist does not believe there was any reason for Plaintiff to turn away from the wall.

(Lindquist Dep. 64:24-66:2.)  Defendant McKesson perceived Plaintiff's twisting and turning as

resistance to his cuff-up order.  (Doc. 115-2, DUF No. 64.)  As a result of the perceived

resistance by Plaintiff, Defendant McKesson took Plaintiff down to the ground.  (*Id.* at DUF No.

65.)  Defendant McKesson did not intend to harm Plaintiff.  (*Id.* at DUF No. 71.)  It is undisputed

that neither Officer Lindquist nor Defendant McKesson knew that Plaintiff had a

hearing-impairment until well after this incident. (*Id.* at DUF No. 70; Lindquist Dep. 37:11-38:2,

38:11-39:4; 41:2-5, 41:12-21, 42:17-25, 46:11-21; McKesson Dep. 35:4-21, 49:23-50:6,

88:9-89:12.)

 "Officers learn of an inmate's disability through the 'deck system' report, when medical

[sic] inform them, or the inmate's self identification to them."  (*Id.* at DUF No. 69.)  Neither

Officer Lindquist nor Defendant McKesson knew that Plaintiff had a hearing-impairment until

well after this incident. (*Id.* at DUF No. 70.)

This evidence shows that on March 6, 2006, Defendant McKesson had no knowledge of

Plaintiff's hearing impairment, felt threatened by Plaintiff stating that he could dust Defendant

McKesson off with a 602, and perceived Plaintiff's twisting and turning as resisting Defendant

McKesson's attempts to place Plaintiff in handcuffs.  It also shows that Plaintiff does not know

whether Defendant McKesson gave him any kind of order after Plaintiff turned to leave the office

area.

The Court finds that this evidence is sufficient, as to Plaintiff's claim that Defendant

McKesson used excessive force in violation of the Eighth Amendment, to meet Defendant McKesson's initial burden of informing the Court of the basis for his motion and identifying admissible evidence to demonstrate the absence of a genuine issue of material fact. The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of his contention that the dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *First Nat'l Bank*, 391 U.S. at 289; *Strong v. France*, 474 F.2d 747, 749 (9th Cir. 1973).

### 2. **Plaintiff's Opposition**

Plaintiff submits the following evidence in opposition to Defendant McKesson's motion for summary judgment. On March 6, 2006, Plaintiff was released to his cell in D facility to take a shower. (Doc. 115-2, DUF No. 49.) While in the shower, Plaintiff observed Defendant McKesson and Officer Lindquist remove glue sticks from his cell. (*Id.* at DUF No. 50.) Plaintiff then walked to the sallyport entrance to find Defendant McKesson and ask him why he had taken Plaintiff's glue sticks. (Doc. 131-2, PDF No. 6.) Plaintiff understood that speaking with an officer was the proper procedure for objecting to the removal of property from an inmate's cell. (*Id.* at PDF No. 7.)

Plaintiff observed Defendant McKesson talking to a gentleman in civilian clothing. (*Id.* at PDF No. 8.) Plaintiff asked Defendant McKesson if he could speak with him. (*Id.* at PDF No. 9.) Defendant McKesson then told Plaintiff to stand behind a yellow security line, and Plaintiff complied. (*Id.* at PDF No. 10.) Defendant McKesson then told Plaintiff to keep his "fucking mouth shut" and that he was "tired of you grown men acting like little kids." (*Id.* at PDF Nos. 11, 12.) Defendant McKesson then went to his office. (*Id.* at PDF No. 13.)

Plaintiff followed Defendant McKesson to the office, but stayed outside of the door. (*Id.* at PDF No. 13, 14.) Defendant McKesson then told Plaintiff that the glue sticks were his now and put them on top of his desk. (*Id.* at PDF No. 15.) Plaintiff requested a 602 -- an inmate

grievance form.  (*Id.* at PDF No. 16.) Officer McKesson then said "so now you're going to snitch on me?" and told Plaintiff that "this is my house."  (*Id.* at PDF Nos. 17, 18.)  Officer McKesson asked Plaintiff why he was standing in the door trying to look tough.  (*Id.* at PDF No. 19.) Officer McKesson then began to size up Plaintiff  and asked how big he was.  (*Id.* at PDF No. 20.)  Plaintiff responded by telling Officer McKesson that "you're physically bigger than me, but if you give me a 602 I can dust you off."  (*Id.* at PDF No. 21.)  When Officer McKesson asked if Plaintiff was threatening him, Plaintiff responded "no, I think I can dust you off with a 602."  (*Id.* at PDF Nos. 22, 23.)  During these conversations Plaintiff was only able to communicate with Officer McKesson because he could read lips and hear a little.  (Doc. 115-2, at DUF No. 55.)

Plaintiff then turned to go back towards his cell and stated that he was "out of here." (Doc. 131-2, PDF No. 24.)  As Plaintiff was going towards his cell, Officer McKesson grabbed him from behind and threw Plaintiff face forward to the floor.  (*Id.* at PDF No. 25.)  Plaintiff did not hear anything between the time he turned to walk towards his cell and when Officer McKesson grabbed him.  (*Id.* at PDF No. 26.)  Plaintiff sustained significant injuries as a result of Officer McKesson's use of force, primarily a broken hand.  (*Id.* at PDF No. 27.)  Doctor Smith scheduled Plaintiff for immediate surgery, which was performed on March 16, 2006.  (*Id.* at PDF Nos. 28, 29.)  Plaintiff still takes pain medication for his hand.  (*Id.* at PDF No. 30.)  Without such medication, he describes the pain in his hand as a seven on a one-to-ten scale.  (*Id.* at PDF No. 32.)

Officer McKesson filed a Rules Violation Report against Plaintiff for threatening a public official.  (*Id.* at PDF No. 34.)  On March 12, 2007, Senior Correctional Lieutenant Black interviewed  Plaintiff regarding the incident.  (*Id.* at PDF No. 35.)  Lieutenant Black concluded that Plaintiff was not guilty of the violation because Plaintiff's statements did not meet the criteria for a credible threat.  (*Id.* at PDF Nos. 36, 37.)  Lieutenant Black found that no explicit threat was made, and that Officer McKesson did not report any aggressive behavior on the part of Plaintiff by his stating "I can dust you off."  (*Id.* at PDF No. 36.)

Former Warden Daniel Vasquez also provided expert witness testimony. Mr. Vasquez was a warden in CDCR for over ten years.  (*Id.* at PDF No. 38.)  He has been a Corrections

1   Department Consultant since 1986 for a variety of state corrections departments. (*Id.* at PDF No.

2   39.) Mr. Vasquez has been deposed as an expert witness in approximately sixty-five cases. (*Id.*

3   at PDF No. 40.) He testified that, in his opinion, Plaintiff did not threaten Officer McKesson

4   and Officer McKesson used excessive force against Plaintiff. (*Id.* at PDF Nos. 41, 42.)

5         Plaintiff argues that this evidence shows that Defendant McKesson is not entitled to

6   summary judgment because he used unreasonable force against Plaintiff in the absence of a

7   legitimate threat to his safety. (Doc. 131, Plntf. Opp. to MSJ, 10:12-15:21.) In support of this

8   proposition, Plaintiff argues that it was unreasonable for Defendant McKesson to feel threatened

9   by Plaintiff's statement that he could "dust off" Defendant McKesson with a 602, which is

10  nothing more than a piece of paper; Plaintiff told Defendant McKesson that he was not

11  threatening him; Defendant McKesson's Rules Violation Report against Plaintiff was denied and

12  it was found that Plaintiff did not pose a threat to Defendant McKesson; and Plaintiff's retained

13  expert opined that, given all of the circumstances, Plaintiff did not threaten or pose a threat to

14  Defendant McKesson. (*Id.* at 11:1-15; Doc. 131-1, Plntf. Obj. to DUF Nos. 57, 58.)

15        Plaintiff also submits evidence and argument to show that Defendant McKesson's version

16  of the incident is disputed. Plaintiff disputes Defendant McKesson's facts that Plaintiff initially

17  complied with his order to cuff-up by placing his hands on the office window and then resisted

18  when Defendant McKesson attempted to place the cuffs. (*Id.* at 11:16-12:8.) Plaintiff points to

19  the fact that this is inconsistent with the acknowledgment in Defendant McKesson's motion that

20  Plaintiff did not know whether Defendant McKesson gave him a cuff up order, presumably

21  because Plaintiff is hearing impaired and had his back to Defendant McKesson. (*Id.*; Doc. 131-2,

22  Plntf. Add. Facts (hereinafter "PF"), No. 26; Doc. 115-1, Def. P&A, 12:24-25.) Further, Plaintiff

23  presents evidence, via his own deposition testimony, that after the verbal confrontation with

24  Defendant McKesson, Plaintiff "turned to leave and head back to his cell when Officer

25  McKesson took him to the ground" (*id.*; Doc. 115-1, 12:21-22; Doc. 131-2, PF No. 25) which is

26  inconsistent with Defendant McKesson's assertion that Plaintiff placed his hands on the office

27  window and then resisted when Defendant McKesson attempted to place him in handcuffs (Doc.

28  115-1, 11:16-12:8, 12:24-27). Plaintiff also argues that just because Defendant McKesson

perceived Plaintiff's actions as threatening does not make his use of force constitutionally permissible.  (Doc. 131, Plntf. Opp., 12:9-13:7.)

Plaintiff correctly argues, and his evidence shows, that the reason for Defendant McKesson taking Plaintiff to the ground (whether in response to Plaintiff's physical resistance to being cuffed up, or as an act of rage possibly precipitated by Officer McKesson's perception that Plaintiff ignored him when Plaintiff simply did not hear any further order) is a disputed issue of material fact.[5]  When a prison security measure is undertaken, the question of whether the measures taken inflicted unnecessary and wanton pain and suffering depends on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Hudson v. McMillian*, 503 U.S. 1, 4, 5-7 (1992).

If both Defendant McKesson's perception that he was threatened by Plaintiff and his scenario of events is accepted, his use of force could be seen as reasonable.  On the other hand, if Plaintiff's scenario of events is accepted, there would have been no reason for Defendant McKesson to have utilized any force.  It would be inappropriate to grant Defendant McKesson's motion for summary judgment since inferences can be drawn for both lawful and unlawful conduct.  *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985).

Since Defendant McKesson's motion for summary judgment should be denied on the merits, we must next turn to his request for qualified immunity.

### 3.   <u>Qualified Immunity</u>

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v.Katz*, 533 U.S. 194, 200 (2001) (*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), overruled on other grounds by *Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 818 (2009)).  In applying the

---

[5] Plaintiff's evidence established that this is a disputed issue of material fact even without reliance on the testimony of Plaintiff's expert witness, Warden Daniel L. Vasquez.  Thus, Defendants' objections to Mr. Vasquez's opinions need not be addressed at this time.

two-part qualified immunity analysis, it must be determined whether, "taken in the light most favorable to [Plaintiff], Defendants' conduct amounted to a constitutional violation, and . . . whether or not the right was clearly established at the time of the violation." *McSherry v.City of Long Beach*, 560 F.3d 1125, 1129-30 (9th Cir.2009).  These prongs need not be addressed by the Court in any particular order.  *Pearson*, 129 S.Ct. at 818.  "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*."  *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010) *ref. Saucier*, 533 U.S. at 201-02.

Defendant McKesson argues that he is entitled to qualified immunity because even if he did violated Plaintiff's Eighth Amendment rights, a reasonable correctional officer in his same position would not have known that his conduct was unlawful, and that, given the information Defendant McKesson had at the time of his interactions with Plaintiff, he acted reasonably and performed his duties in good faith.  (Doc. 115-1, Def. MSJ, 2:10-15.)

Taken in the light most favorable to Plaintiff (i.e. accepting Plaintiff's version of events that Defendant McKesson tackled him to the ground when he was amicably returning to his cell) Defendant McKesson's conduct would amount to a constitutional violation via the use of excessive force.  The right of prisoners to be free from excessive force was firmly established long before 2006.  *See Farmer v. Brennan,* 511 U.S. 825 (1994); *Hudson v. McMillian*, 503 U.S. 1 (1992); *Whitley v. Albers*, 475 U.S. 312 (1986).  Further, since the investigation by Lieutenant Black found that Plaintiff's statements did not meet the criteria for a credible threat (Doc. 131-2, PDF Nos. 36, 37) it cannot be said, as a matter of law, that Defendant McKesson acted reasonably under the circumstances.

Accordingly, Defendant McKesson is not entitled to qualified immunity on Plaintiff's claims such that his motion for summary judgment thereon should be denied.

## VIII.   Conclusions and Recommendations

Accordingly, this Court finds that Defendant Wofford is entitled to summary judgment on Plaintiff's claims against her.  However, Plaintiff established a triable issue of fact as to his claim of excessive force against Defendant McKesson such that Defendant McKesson is not entitled to

summary judgment either on the merits of Plaintiff's claim against him or via qualified

immunity.

As set forth herein, the Court HEREBY RECOMMENDS:

(1)     that Defendant Wofford is entitled to judgment as a matter of law such that her

         Motion for Summary Judgment, filed December 6, 2010 (Doc. 115), should be

         GRANTED; and

(2)     that Defendant McKesson is neither entitled to judgment as a matter of law, nor to

         qualified immunity such that his Motion for Summary Judgment, filed December

         6, 2010 (Doc. 115), should be DENIED.

These Findings and Recommendations will be submitted to the United States District

Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within

**thirty (30) days** after being served with these Findings and Recommendations, the parties may

file written objections with the Court.  The document should be captioned "Objections to

Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file

objections within the specified time may waive the right to appeal the District Court's order.

*Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    February 10, 2011**                         _____/s/ Sandra M. Snyder_____
                                                        UNITED STATES MAGISTRATE JUDGE